UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN HOUSTON,

       Plaintiff,

v.                                              Case No. 8:24-cv-02243-JSM-NHA

CAPE HAZE TAVERN, LLC,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff John Houston moves for default judgment against Defendant Cape Haze Tavern, LLC and asks the Court to award Plaintiff $14,400 in lost wages, $14,400 in compensatory damages, $15,000 in punitive damages, a $7,480 attorney's fee, and $1,681.10 in costs, for a total award of $52,961.10. Doc. 29. I respectfully recommend the Court grant the motion in part. Specifically, I recommend that the Court enter judgment for Plaintiff and against Defendant on Counts I and II, award Plaintiff $4,792.11 in backpay and $500 in compensatory damages, and order additional briefing on Plaintiff's request for costs and an attorney's fee.

1

## I.      Facts

The Complaint alleges the following:

Defendant operates a restaurant. Compl. (Doc. 1) ¶ 1. Defendant employed Plaintiff as a server, beginning in April 2023. *Id.* ¶ 11.

On July 28, 2023, the Plaintiff had trouble seeing out of one of his eyes; he notified the Defendant that he would miss a scheduled shift, to seek medical care. *Id.* ¶¶ 12, 13. Plaintiff was diagnosed with optic neuritis[1] and "briefly hospitalized." *Id.* ¶ 14. Upon discharge from the hospital, a peripherally inserted central catheter (PICC) line remained in Plaintiff's upper arm, to continuously administer penicillin. *Id.* ¶ 16.

Plaintiff told Defendant that he was medically cleared to return to work on August 15, 2023, but Defendant requested that he not work until his PICC line was removed. *Id.* ¶ 17. Later, Defendant offered Plaintiff the option to work as a dishwasher, rather than a server, while the PICC line remained in place. *Id.* ¶ 19. Plaintiff replied that he could not accept the accommodation, because his PICC line bandage could not get wet. *Id.* ¶ 20. Plaintiff informed the Defendant that he had a right to continue working as a server, showing Defendant's management an EEOC employee rights poster that explained the

---

[1] According to the Mayo Clinic "Optic neuritis occurs when swelling (inflammation) damages the optic nerve." https://www.mayoclinic.org/diseases-conditions/optic-neuritis/symptoms-causes/syc-20354953

statutory protections provided to workers with disabilities and, later, producing medical documentation confirming he could "work without restriction." *Id.* ¶¶ 21, 22. Defendant did not place Plaintiff back on the schedule. *Id.* ¶ 24.

Plaintiff informed Defendant that his PICC line had been removed on August 25, 2025, and asked to be placed back on the schedule. *Id.* ¶ 25. He asked again the next day. *Id.* ¶ 27. Management responded, "I spoke with the powers last night and the reasons [for your termination] were basically you don't threaten to sue and keep your job. It was assumed that you quit by that." *Id.* ¶ 27. Plaintiff maintains he continued to seek shifts with Defendant, but was denied. *Id.* ¶ 28.

## II.     Procedural History

Plaintiff brought this action on September 24, 2025. Compl. (Doc. 1). Plaintiff asserts two claims—one for disability discrimination (based on Defendant's failure to allow Plaintiff to return to work after he was medically cleared to do so) and one for retaliation (based on Defendant terminating Plaintiff after he asserted his rights under EEO laws). *Id.* Defendant timely answered. Doc. 12. However, shortly thereafter, on December 16, 2025, Defendant's counsel withdrew, leaving Defendant (an LLC) without counsel. Doc. 20. The District Court gave Defendant 60 days to retain new counsel (*id.*)

but Defendant failed to do so; as a result, the District Court granted a motion for Clerk's default against Defendant. Docs. 25, 27.

Plaintiff then filed the present motion for entry of final default judgment, seeking $14,400.00 in back pay, $14,400.00 in compensatory damages, $15,000.00 in punitive damages, a $7,480.00 attorney's fee, and $1,681.10 in costs. Doc. 29. The Court held a hearing on the motion. Doc. 36. Following the hearing, Plaintiff submitted supplemental briefing on some issues that arose during oral argument. Doc. 38.

### III.   Standard of Review

"When a defendant has failed to plead or defend, a district court may enter judgment by default." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1244 (11th Cir. 2015) (citing FED. R. CIV. P. 55(b)(2)). A Clerk's default under Rule 55(a) deems a defendant to admit a plaintiff's well-pleaded allegations of fact. *Id.* at 1245 (citing *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005)). However, a defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Cotton*, 402 F.3d at 1278 (citation and quotations omitted).

So, notwithstanding entry of a Clerk's default, the Court's may enter a default judgment under Rule 55(b) only where the pleadings sufficiently support a judgment. *Id.* In deciding a motion for default judgment, the Court should assess the pleadings by a standard "akin to that necessary to survive a

4

motion to dismiss for failure to state a claim." *Surtain*, 789 F.3d at 1245 (citation omitted). In other words, a court may enter a default judgment only where a pleading contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

If a plaintiff is entitled to default judgment, the court must also consider whether the plaintiff is entitled to the relief it requests. The damages a plaintiff requests are not deemed proven simply by default; rather, the Court must still determine the amount and type of damages to award. *Anheuser Busch, Inc. v. Philpot,* 317 F.3d 1264, 1266 (11th Cir. 2003) ("A court has an obligation to assure that there is a legitimate basis for any damage award it enters . . . ."); *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1543–44 (11th Cir. 1985).

If, to enter or effectuate judgment, it is necessary to conduct an accounting to determine damages, the court may conduct hearings or make referrals as it deems necessary. FED. R. CIV. P. 55(b)(2).

### IV. Analysis

#### a. Subject Matter Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because both counts arise under

the Americans with Disabilities Act (ADA), a federal law codified at 42 U.S.C. § 12101 et seq. Compl. (Doc. 1).

      b. <u>Service of the Complaint</u>

Next, Plaintiff has properly served the Defendant. In seeking a default judgment, Plaintiff bears the burden of establishing proper service of the complaint. "In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). And, "[g]enerally, where service of process is insufficient, the court has no power to render judgment.*" In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1299 (11th Cir. 2003).

Federal Rule of Civil Procedure 4(h)(1) governs the service of process of complaints on United States corporations and applies to limited liability companies (LLCs). *See Fitzpatrick v. Bank of New York Mellon*, 580 F. App'x 690, 693 (11th Cir. 2014) (applying 4(h) to an LLC). It provides that service may be made "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." FED. R. CIV. P. 4(h)(1)(B).

An LLC may also be served by following the law of the state in which the district court is located or in which service is effected. FED. R. CIV. P. 4(h)(1)(A), 4(e)(1). Section 48.062 of the Florida Statutes generally governs service of

process on LLCs in Florida. That statute sets forth a hierarchy of persons who may accept service on an LLC's behalf, starting with the LLC's registered agent. *See* Fla. Stat. § 48.062(2). Under Section 48.091(4)(b), "A person attempting to serve process at the registered office designated pursuant to subsection (2) on a registered agent who is a natural person, if such natural person is not present at the designated registered office at the time of service, may serve the process, including during the first attempt at service, on any employee of such natural person who is present at the designated registered office at the time of service."

Here, Plaintiff served Defendant on October 15, 2024, by serving a copy of the summons and complaint on Jan Broome, who is identified as an employee of Defendant's registered agent, Andreas G. Kirchberger. Doc. 9. The return of service states that Mr. Kirchberger was then unavailable. *Id.* Accordingly, I find Plaintiff served Defendant in accordance with Rule 4.[2]

c. Personal Jurisdiction

In addition to ensuring proper service, a court must ensure it has personal jurisdiction over any defaulting defendants. Rule 4(k)(1)(A) provides that "serving a summons or filing a waiver of service establishes personal

---

[2] I further note that, Defendant's answer did not assert improper service as an affirmative defense. Doc. 12; FED. R. CIV. P. 12(b).

jurisdiction over a defendant[] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."

Plaintiff served Defendant in Florida on October 15, 2024 (Doc. 9), satisfying the first requirement of Rule 4(k)(1)(A). As to the second requirement of Rule 4(k)(1)(A), Defendant is incorporated in Florida and operates a restaurant in Rotunda West, Florida. Compl. (Doc. 1) ¶¶ 1, 7. This is sufficient to establish personal jurisdiction over Defendant. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)) (observing that "for an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home"); *see also Frank v. P N K (Lake Charles) L.L.C.,* 947 F.3d 331, 338 n.10 (5th Cir. 2020) (noting that the reasoning in *Daimler* applies to LLC's because, "The rationale behind this test is to rely on a business's domicile or place of principal business as a guidepost in ascertaining where the business is 'at home.' Considering this premise, the entity type is not germane to this jurisdictional analysis[.]").

The Court has personal jurisdiction over Defendant.

d. <u>Liability</u>

Plaintiff brings two claims—one for disability discrimination (based on Defendant's failure to allow Plaintiff to return to work after he was medically

cleared to do so) and one for retaliation (based on Defendant terminating Plaintiff after he asserted his rights under EEO laws). Compl. (Doc. 1).

Count I–Disability Discrimination

In Count I, Plaintiff alleges that Defendant discriminated against him by refusing to allow Plaintiff to return to his work as a server after he was medically cleared to do so. Compl. (Doc. 1) p. 5.

The ADA makes it unlawful for employers to discriminate against employees based on a disability. 42 U.S.C. § 12112(a). To prevail on a disability discrimination claim at the default judgment stage, a plaintiff must allege sufficient facts to plausibly suggest "(1) that he suffers from a disability, (2) that he is a qualified individual, and (3) that a 'covered entity' discriminated against him on account of his disability." *Surtain*, 789 F.3d at 1246 (quoting *Cramer v. Fla.,* 117 F.3d 1258, 1264 (11th Cir. 1997)).

As to the first prong, Plaintiff must show that he is disabled, as the ADA defines the term. A disability under the ADA is (1) "a physical or mental impairment that substantially limits one or more major life activities;" (2) "a record of such an impairment," meaning that the plaintiff previously had a physical or mental impairment that substantially limited one or more major life activities; or (3) a perception that he has "such an impairment." 42 U.S.C. § 12102(1). Major life activities include, but are not limited to, "seeing." *Id.* at (2)(A). Here, Plaintiff alleges that he suffered from "optic neuritis" in one of his

9

eyes, which caused him to "experience significant visual impairment" and "substantially limit[ed] his ability to see, read, and focus his eyes." Compl. (Doc. 1) ¶¶ 4, 12, 14. I find these are sufficient factual allegations to support that Plaintiff is disabled.

Second, Plaintiff must show that he is a qualified individual. A qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Plaintiff alleges in the Complaint that "[o]n August 15, Plaintiff advised Defendant that he was cleared to return to work" and Plaintiff later "produced medical documentation confirming that he was cleared to work without restriction."[3] Compl. (Doc. 1) ¶¶ 17, 22. I find these allegations sufficient to show that Plaintiff was qualified to perform the essential functions of his role as a server.

---

[3] The Court questioned whether the separate allegation that Plaintiff's "bandage covering his PICC line could not get wet, which made the dishwashing role unsuitable," Compl. (Doc. 1) ¶ 20, contradicted his allegations that he was qualified to perform the essential functions of the server position without accommodation. Doc. 32 ¶ 2. Following additional argument (Doc. 36) and briefing (Doc. 38), the Court is satisfied that Plaintiff's limitation on exposing his upper arm bandage to water did not make him "unqualified" for the position of server. *See Davis v. Florida Poer & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(3)) (in determining whether a task is an essential function of the job a court should consider "the amount of time spent on the job performing the function" and "the consequences of not requiring the incumbent to perform the function.").

As to the third and last element, Plaintiff must show that a covered entity discriminated against him on account of his disability. *Surtain*, 789 F.3d at 1246. An employer (defined to include "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year") is considered a covered entity. 42 U.S.C. §§ 12111(2), 12111(5), 12112(a). And, discrimination under the ADA includes actions taken "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Thus, reassigning an employee to a position that pays less or cutting his hours based on his disability constitutes disability discrimination. *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action."); *Sullivan v. Spee-Dee Delivery Serv., Inc.*, 138 F. Supp. 3d 1050, 1052 (W.D. Wis. 2015) (finding discrimination element satisfied when the defendant employer reassigned the plaintiff employee to a position with a lower rate of pay, fewer hours and no benefits because of his epilepsy). The reassignment need not be based directly on the disability but can be based on "[a]dverse effects of [the] disabilit[y] and adverse or side effects from the medical treatment of [the] disabilit[y]," as these "arise because of the

11

disability." *Felix v. New York City Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003) (internal quotations omitted).

Here, the Complaint alleges that Defendant was Plaintiff's employer and fell within the ADA's definition of employer. Compl. (Doc. 1) ¶ 3 ("At all times material hereto, Plaintiff lived in Sarasota County, Florida, and worked for Defendant in Sarasota County until Defendant terminated his employment."); ¶ 8 ("Defendant is engaged in an industry affecting commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . ."). And, it establishes that, after attempting to return to work following treatment for his optic neuritis, Defendant expressed concern with Plaintiff's PICC line, initially telling him he could not return to work with the PICC line. *Id.* ¶ 17. After Plaintiff requested a meeting, Defendant told Plaintiff he could work as a dishwasher (which is known to be a lower-paying, entry-level position), and not the server position that he was working in prior to developing optic neuritis and needing the PICC line, and failed to schedule him for server shifts. Compl. (Doc. 1) ¶¶ 18, 19. Reassigning an employee to a position that pays less or cutting his hours based on treatment for his disability constitutes disability discrimination. *See Cotton*, 434 F.3d at 1231 ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action."); *see also E.E.O.C. v. Chipotle Mexican Grill*, 98 F. Supp. 3d 198, 215 (D. Mass. 2015)

12

(Plaintiff showed *prima facie* case of discrimination when charging party was terminated one day after she appeared at work with a PICC line to treat her disability). Thus, I find Plaintiff has satisfied the final requirement for default judgment on his disability discrimination claim.

Accordingly, I recommend judgment be entered in favor of Plaintiff and against Defendant on Count I.

### Count II–Retaliation

In Count II, Plaintiff brings a claim for retaliation under the ADA, alleging that, after Plaintiff suggested that the Defendant's refusal to allow him to return to work as a server violated EEO laws, Defendant terminated his employment in retaliation. Compl. (Doc. 1) p. 6.

Under the ADA, no person shall discriminate "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To prevail on a retaliation claim, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the two. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).

The first element is established if the plaintiff can show that he opposed what he reasonably believed was an unlawful employment practice. *Wu v.*

*Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989). Here, Plaintiff alleges that, after the Defendant refused to let him return to work as a server, he told Defendant's management that "he was [legally] protected from being prevented from working" and showed them "an EEOC employee rights poster that explains the statutory protections provided to workers with disabilities." Compl. (Doc. 1) ¶ 21. Additionally, Plaintiff alleges that he texted management to "reiterate his objections to their refusal to allow him to return to work and indicat[e] his intention to potentially seek legal intervention." *Id.* ¶ 23. I find these allegations sufficient to show that Plaintiff opposed what he perceived to be an unlawful employment practice (failing to return him to his position as a server following his hospitalization for optic neuritis).

Moving to the second element, an adverse employment action is one that results in "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 760–61 (1998) (This standard would encompass "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Termination is an adverse employment action. *Ellerth*, 524 U.S. at 761; *Jackson v. Blue Bird Corp.*, 792 F. App'x 706, 711 (11th Cir.

14

2019). And, the Eleventh Circuit has stated that "[a] reduction in an employee's hours, which reduces the employee's take-home pay" is an adverse employment action. *Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1231 (11th Cir. 2006); *see also Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 894 (11th Cir. 2013) ("[A] non-trivial reduction in work hours may qualify as an adverse employment action")*; Hendersonville v. City of Grantville, Ga.*, 37 F. Supp. 3d 1278, 1283 (N.D. Ga. 2014) (concluding that the plaintiff established an adverse employment action, even if he had not been formally terminated, because his hours had "been cut to zero.")

The Complaint states that Defendant failed to place Plaintiff on the schedule after he engaged in protected activity, and a text on August 26, 2023 confirmed that Defendant had no intention of placing Plaintiff back on the schedule, as Defendant stated, "you don't threaten to sue and keep your job." Compl. (Doc. 1) ¶¶ 21, 24, 27. These allegations satisfy the adverse employment action prong, as reducing an employee's hours to zero and terminating the employee both qualify as adverse employment actions. *See Ellerth*, 524 U.S. at 760–61; *Cotton*, 434 F.3d at 1231.

For the final element, the Eleventh Circuit has interpreted the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Simmons v. Camden County Bd. of Ed.*, 757 F.2d 1187, 1189 (11th Cir.), *cert.*

*denied*, 474 U.S. 981 (1985). A plaintiff may prove the causal connection through direct evidence that the employment action was related to the protected activity. *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998). Alternatively, "a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). "[A] period as much as one month between the protected expression and the adverse action is not too protracted." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Here, Plaintiff offers direct evidence of the discrimination: when Plaintiff inquired about why he was not placed on the schedule, Defendant texted him "you don't threaten to sue and keep your job." Compl. (Doc. 1) ¶ 27. This is sufficient to connect Plaintiff's protected activity with the adverse employment action. And, even if it was not, the Complaint establishes that only eleven days passed between Plaintiff's August 15 protected activity (a complaint made directly to management) and management communicating on August 26 that Plaintiff was terminated. *Id.* ¶¶ 18, 21, 27. This close temporal proximity is also sufficient to establish causation.

Because Plaintiff's well-pleaded allegations establish each element of his retaliation claim, I recommend judgment be entered in favor of Plaintiff and against Defendant on Count II.

### e. Damages

#### 1. Backpay

Plaintiff seeks backpay in the amount of $14,400, which he states represents the difference between the wages he would have made working for Defendant between his August 15, 2023 termination and March 2, 2024, and what he did make. Doc. 29.

At the damages hearing, Plaintiff testified that he made about $700 a week working for Defendant. Doc. 36 (minutes) at 55:55–56:21. Plaintiff testified that, as soon Defendant terminated him, he sought jobs through online applications such as Indeed and LinkedIn, as well as through word-of mouth. *Id.* 1:08:20–1:08:46. Plaintiff states that "Following his August 15, 2023, termination, he was without work for seven weeks, until he was able to secure a new job at Oak and Stone on October 2, 2023." Doc. 29 p. 5. He was paid more in that position than he was in his role with Defendant. *Id.* But he was "forced to resign" from that position three weeks later because of the long commute. *Id.* That is, he determined it was not tenable for him to commute for the job at Oak and Stone. Doc. 36 at 1:09:50–1:10:13. Thus, upon securing another job closer to home (at Rum Bay), he immediately ceased work at Oak

17

and Stone. *Id.* 1:10:00–1:10:30. At Rum Bay, Plaintiff made less than he made while working for Defendant. *Id.* 1:10:40–1:10:50. He worked at Rum Bay for 4 weeks before it was shut down due to flood damage. Doc. 29 p. 6.  Plaintiff then began another job search, using word-of-mouth and online search engines. Doc. 36 at 1:11:10–1:11:40. Plaintiff was unemployed for another thirteen weeks until, on March 2, 2024, he secured a position at Ken and Barb's where he made more than he did with Defendant. Doc. 29 p. 6.

Plaintiff's backpay request breaks down as follows:

| Time Period | Employer | Weekly Wages | Backpay Sought |
|---|---|---|---|
| August 15, 2023–October 1, 2023 (48 days). Doc. 29-2 ¶ 14. | None. Doc. 29-2 ¶ 14. | None. Doc. 29-2 ¶ 14. | $4,792.11 ($698.85[4] per week he would have made working for Defendant). Doc. 29-2 ¶ 3; Doc. 37-1 ($11,181.64 gross earnings over 16 weeks) |
| October 2, 2023–October 23, 2023 (22 days). Doc. 29-2 ¶ 14. | Oak & Stone. Doc. 29-2 ¶ 14. | $1,153.85. Doc. 29-2 ¶ 14. | None (as he was paid more than the $698.85 per week he would have made working for Defendant). |

---

[4] Composite Exhibit A (Doc. 37-1) admitted at the damages hearing shows that Plaintiff made $11,181.64 gross earnings over 16 weeks, meaning an average of $698.85 per week.

18

| | | | |
|---|---|---|---|
| October 24, 2023–November 2, 2023 (10 days). Doc. 29-2 ¶¶ 14, 15. | None (quit Oak & Stone because of "untenable" commute from Englewood to Bradenton). Doc. 29-2 ¶ 14. | None. | None.[5] |
| November 2, 2023–November 29, 2023 (28 days). Doc. 29-2 ¶ 15. | Rum Bay Restaurant. Doc. 29-2 ¶ 15. | $600. Doc. 29-2 ¶ 15. | $395.40 (difference between $698.85 per week he would have made working for Defendant and $600 he made per week working for Rum Bay). Doc. 29-2 ¶¶ 3, 15; Doc. 37-1 ($11,181.64 gross earnings over 16 weeks) |
| November 30, 2023–March 1, 2024 (93 days). Doc. 29-2 ¶¶ 15, 16. | None (Rum Bay sustained significant flooding damage and closed for repairs). Doc. 29-2 ¶ 15. | None. | $9,284.72 ($698.85 per week he would have made working for Defendant). Doc. 29-2 ¶ 3; Doc. 37- |

---

[5] Plaintiff does not seek back pay for this period. *See* Doc. 29 p. 6 (noting $700 in lost wages during this time frame but then excluding that $700 from the calculation of total lost wages sought, as the total ($14,400) is the sum of the other amounts of lost wages ($4,900, $400, $9,100)); Doc. 36 (minutes) 1:29:20–1:29:35 (Plaintiff's counsel stating that they understand the court might not want to award fees for this time because it was Plaintiff's "own decision" to leave Oak and Stone).

.

19

| | | | 1 ($11,181.64 gross earnings over 16 weeks) |
|---|---|---|---|
| March 2, 2024– | Ken and Barb's. Doc. 29-2 ¶ 16. | $750, at a minimum. Doc. 29-2 ¶ 16. | None (as he was paid more than the $698.85 per week he would have made at Defendant). Doc. 29-2 ¶¶ 3, 14; Doc. 37-1 ($11,181.64 gross earnings over 16 weeks) |

Once a plaintiff proves discrimination under the ADA, he is "presumptively entitled to back pay." *Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1472 (11th Cir. 1985). 42 U.S.C. § 2000e-5 authorizes "recovery of back pay for up to two years preceding the filing of the charge[.]" 42 U.S.C. § 2000e-5(e)(3)(B); *see also* 42 U.S.C. § 12117(a) (adopting § 2000e-5's enforcement mechanisms as those for the ADA). "[A]n award of back pay is intended to make the claimant whole, not to confer a windfall." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1378 (S.D. Fla. 1998). To calculate a back pay award, "the trial court must determine what the employee would have earned had []he not been the victim of discrimination, and must subtract from this figure the amount of actual interim earnings." *Id.* Back pay is generally calculated from

20

the date of the adverse employment action until the date of judgment. *Id.* at 1377.

As an equitable remedy, back pay will not be awarded absent a plaintiff's good-faith effort to mitigate damages. *Richardson v. Tricom Pictures & Prods., Inc.*, 334 F. Supp. 2d 1303, 1310 (S.D. Fla. 2004), *aff'd*, 183 F. App'x 872 (11th Cir. 2006). Thus, a plaintiff must mitigate damages "by seeking employment 'substantially equivalent' to the position she was denied." *Joe's Stone Crab*, 15 F. Supp. 2d at 1378 (quoting *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991)). "'Substantial equivalence' involves more than just similar work—it considers such factors as pay and benefits, promotional opportunities, job responsibilities, working conditions, comparable hours, distance from home, dangerousness, and comparability of status." *Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1211 (10th Cir. 2021). Should a discharged employee "lower his sights" and obtain *non-comparable* employment, he need not remain in that role. *Weaver*, 922 F.2d at 1527. However, once a discharged employee finds substantially equivalent employment, his duty to mitigate includes a duty to retain that employment. *Sennello v. Rsrv. Life Ins. Co.*, 667 F. Supp. 1498, 1513 (S.D. Fla. 1987), *aff'd*, 872 F.2d 393 (11th Cir. 1989) (citing *Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1273 (4th Cir. 1985)). The employee may only recover back pay after leaving a substantially equivalent employer when the evidence establishes

21

that the employee's working conditions were so intolerable that he was forced to leave. *Jurgens v. EEOC*, 903 F.2d 386, 389 (5th Cir. 1990) ("[I]n order for an employee to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that the employer constructively discharged the employee."); *see also Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) ("To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in [his] position would have been compelled to resign."); *Sennello*, 667 F. Supp. at 1514 (quoting *Brady,* 753 F.2d at 1273) ("[T]he back pay award to a claimant who voluntarily terminates interim employment should only be reduced if the claimant lacked 'compelling or justifying reasons' for having quit the job"); *Shealy v. City of Albany*, 137 F. Supp. 2d 1359, 1364 (M.D. Ga. 2001) (citing *Morrison v. Genuine Parts Co.,* 828 F.2d 708, 710 (11th Cir. 1987)) ("In order to be eligible for back pay after one leaves their employer, the employee must prove that he or she was 'constructively discharged.'").

Each period comprising Plaintiff's back pay request must be analyzed in turn.

First, Plaintiff seeks $4,792.11 for the 48 days between August 15, 2023, when he was cleared by his doctor to return to his role as a server but Defendant refused to allow him to return to work, and October 2, 2023, when

he started work at Oak and Stone. He seeks the full salary he would have made working for Defendant during this period. I credit Plaintiff's testimony that he diligently sought other work opportunities during this period[6] and accepted an offer at the first place to hire him, Oak and Stone. Doc. 36 (minutes) at 1:07:30–1:08:51. Accordingly, I recommend that the District Court award the $4,792.11 in back pay for this period.

Next, I consider whether Plaintiff's employment at Oak and Stone terminated any entitlement to subsequent claims for back pay. At the September 26, 2025 hearing, Plaintiff presented case law supporting the point that a discharged employee has no obligation to retain employment that is *not* substantially equivalent to his prior job. Doc. 36 (minutes) at 1:48:20–1:49:12 (discussing *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991)). Curiously, however, Plaintiff took the position that Plaintiff's employment at Oak and Stone *was* substantially equivalent to his employment with Defendant. *Id.* 1:49:12–1:49:30 ("They are substantially equivalent"). The

---

[6] I questioned at the hearing whether, in light of the fact that Plaintiff's doctor cleared him to work "without restrictions," Plaintiff could have mitigated his damages by working as a dishwasher for Defendant from August 16, 2023 until his August 25, 2023 termination. *See* Ex. D (Doc. 37-3). However, I am satisfied by the argument in his additional briefing (Doc. 38) that the doctor's note was specific to Plaintiff's return to work as a server (and did not necessarily clear him to work as a dishwater) given that the Defendant was permitted only to inquire about Plaintiff's ability to perform functions related to his job (as a server). 29 C.F.R. § 1630.14(a).

Court explicitly and repeatedly invited Plaintiff to make an argument that Oak and Stone was *not* substantially equivalent. *Id.* at 1:51:45–1:51:53 ("Doesn't your argument have to be its not substantially equivalent because of the commute . . . ?"); 1:52:05–1:52:13 ("Don't you have to argue this is not substantially equivalent for [the Court] to apply [*Weaver*]?"); 1:53:04–1:52:11 ("If you tell me its substantially equivalent, [*Weaver*] is not on point.")

Plaintiff declined to argue that the Oak and Stone employment was *not* substantially equivalent, either at the hearing or in subsequent briefing (Doc. 38). Because "district courts cannot concoct or resurrect arguments neither made nor advanced by the parties," *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011), I must proceed on the argument that Plaintiff's employment at Oak and Stone was substantially equivalent to his employment with Defendant. If that is so, the law terminates Plaintiff's entitlement to further back pay, unless the employee's working conditions were so intolerable that he was forced to leave. *Jurgens*, 903 F.2d at 389. "If an employee suffers a wil[l]ful loss of earnings, however, the employer's backpay liability is tolled." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168–69 (6th Cir. 1996) (citation and internal quotations omitted).

Plaintiff has presented no case law to support the conclusion that a 50-mile commute constitutes "intolerable" working conditions (*see* Doc. 38) and, at the September 26, 2025 damages hearing, he characterized his decision to

24

leave Oak and Stone before his start date at Rum Bay as his "own decision" rather than one forced upon him. Doc. 36 (minutes) 1:29:31–1:29:35. In light of Plaintiff's position that the Oak and Stone job was substantially equivalent to Plaintiff's job with Defendant, I find that Plaintiff had a duty to mitigate his damages by maintaining his employment with Oak and Stone and that his failure to do so precluded him from seeking back pay after leaving the Oak and Stone job. Therefore, I recommend the Court award no back pay after October 2, 2023, when Plaintiff started work at Oak and Stone.

Plaintiff demonstrates that he is entitled to $4,792.11 in back pay.

### 2.   Compensatory Damages

Next, Plaintiff seeks $14,400 in compensatory damages comprising "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." Doc. 29 p. 6. The ADA incorporates the enforcement mechanism set forth in Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* 42 U.S.C. § 12117(a). Thus, a Plaintiff who prevails on an ADA discrimination claim[7] can recover compensatory

---

[7] Although the Eleventh Circuit has never addressed this issue, *see Kovelesky v. First Data Corp.*, 534 F. App'x 811, 816 (11th Cir. 2013) (recognizing that the Eleventh Circuit has not addressed this issue); *Ganstine v. Sec'y, Fla. Dep't of Correction*, 502 F. App'x 905, 910 n.6 (11th Cir. 2012) (same), the Seventh and Ninth Circuits have found that employees cannot recover compensatory or punitive damages for retaliation claims brought under the ADA, *Kramer v. Bank of Am. Sec.*, 355 F.3d 961, 965 (7th Cir. 2004),

damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3); *see also Doss-Clark v. Babies & Beyond Pediatrics, P.A.*, No. 8:06-CV-1760-T-23MAP, 2007 WL 1577770, at *4 (M.D. Fla. May 31, 2007) ("Under the ADA, a plaintiff, provided she presents evidentiary support, may be awarded compensatory damages for future pecuniary losses, emotional pain and suffering, inconvenience, and mental anguish.") (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1333 (11th Cir. 1999)). "Compensatory damages 'may be inferred from the circumstances as well as proved by the testimony.'" *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) (quoting *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999)).

As to compensatory damages, Plaintiff testified that the discrimination caused him to suffer from anxiety and depression and that, following his termination, he lacked energy and isolated himself. Doc. 36 (minutes) at

---

*cert. denied*, 542 U.S. 932 (2004); *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009); *but see Rumler v. Dep't of Corr., Fla.*, 546 F. Supp. 2d 1334, 1342 (M.D. Fla. 2008) ("[A] plaintiff claiming retaliation under the ADA in the employment context has the right to the same remedies and procedures available to a plaintiff alleging intentional employment discrimination."). Given that I recommend a liability finding on the ADA discrimination claim (Count I), I need not decide whether this relief is also available under the retaliation claim.

1:13:35–1:15:20; 1:16:50–1:18:40. He said he sought therapy and psychiatric help, for which he spent $500. *Id.* 1:16:43–1:18:40; *Id.* 1:19:00–1:19:20; *see also* Comp. Ex. F (Doc. 37-1). He testified that his experience with Defendant continued to impact him, and caused him to continue to seek mental health support and medication. *Id.* 1:21:40–1:22:20.

I partially credit his testimony. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."). While the termination from his 3-month-long employment period with Defendant appears to have caused Plaintiff to feel stress and anger, Plaintiff also testified about other hardships he experienced during the relevant period, including developing a visual disability, experiencing hurricanes, and losing another job due to a natural disaster. Doc. 36 (minutes) at 1:15:18–1:15:35; 1:10:50–1:10:58. Indeed, when questioned about this, Plaintiff agreed that it would be "fair to assume" that his physical disability, together with his experience with Defendant and his subsequent employers, contributed to his poor mental health during the relevant period. *Id.* 1:22:29–1:23:17.

In light of the nature of the evidence offered to support his claim to non-economic damages, and the evidence that any such damages appear to have

derived from a variety of factors, I recommend the District Court award Plaintiff $500 in compensatory damages.

### 3. Punitive Damages

Next, Plaintiff seeks $15,000 in punitive damages.

The ADA incorporates the enforcement mechanism set forth in Title VII. 42 U.S.C. § 12117(a). And, under Title VII, a prevailing party on an ADA discrimination claim may recover punitive damages[8] "if the complaining party demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §§ 1981a(b)(1), 12117(a); *see Thomas v. Alabama Home Const.*, 271 F. App'x 865, 869 (11th Cir. 2008). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999); *see Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002) ("Malice or reckless indifference is established by a showing that the employer discriminated in the face of the knowledge that its actions would violate federal law.").

---

[8] *See* n. 7, *supra.*

Here, the text messages introduced by Plaintiff at the September 26, 2025 damages hearing undermine Plaintiff's request for punitive damages (and, potentially even the well-pleaded allegations in the Complaint, which I must—and did—accept as true, given the Clerk's default, *see Surtain*, 789 F.3d at 1245[9]). These text messages indicate that Defendant did not preclude Plaintiff from working as a server due to his disability but because Defendant did not know whether, and was concerned that, "the IV and medicine attached to [Plaintiff's] body pose[d] a health risk[] [to customers] while serving food in a commercial restaurant to the public." Comp. Ex. B (Doc. 37-2) pp. 8–9. Defendant asked for a doctor's note addressing the concern. *See id.* p. 4 ("can you g[e]t a doctor's letter saying it's all good. An email with letterhead would be fine. I'm trying for you bud. Her concern is if your bag pops . . . with contamination"); *id.* p. 5 ("What is needed is a doctor's note saying there is no issue with medication in a [f]ood service scenario. I e contamination or possible reactions to contact. Basically that being around food is ok.").

---

[9] Although Rule 55(b) additionally allows the Court to conduct an evidentiary hearing to "establish the truth of any allegation by evidence," given that Defendant was deemed to have admitted the well-pleaded allegations in the Complaint, the Court only set an evidentiary hearing on the issue of damages. Doc. 32 ("The Court requires an evidentiary hearing to determine the damages requested in the motion for default judgment."). Thus, the Court limits its consideration of the evidence admitted in the hearing to the issue of damages.

Plaintiff's doctor's note did not address Defendant's public health concerns. Ex. D (Doc. 37-3). And, Plaintiff primarily objected to Defendant's concerns about the danger of penicillin to the public, rather than any perceived discrimination based on disability. Comp. Ex. B (Doc. 37-2) p. 10 ("Your son is allergic to nuts.[] [H]e can still go out to eat. Because we're smart enough to not put it in the food." and "People take and do far more dangerous things than penicillin and you still let them in your doors to work.").

Thus, the evidence submitted by Plaintiff does not demonstrate that Defendant acted with malice or with reckless indifference to Plaintiff's rights under the ADA.

### 4. Post-Judgment Interest

The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Accordingly, I recommend Plaintiff be awarded post-judgment interest on the back pay and compensatory damages the Court awards.

### 5. Attorney's Fee and Costs

Should the Court grant default judgment in Plaintiff's favor, he would be the prevailing party entitled to an attorney's fee and costs, in the court's

30

discretion. *See* 42 U.S.C. § 12205. "[A] prevailing *plaintiff* in a[n ADA][10] proceeding is ordinarily to be awarded attorney's fees by the district court in all but special circumstances." *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 412 (1978).

While Plaintiff seeks a fee and costs in his motion for default judgment (Doc. 29), after he quantified his fee and costs, Plaintiff's attorney spent significant time preparing for and attending the September 26, 2025 damages hearing (Doc. 36) and submitting supplemental briefing (Doc. 38), and he also incurred additional costs (making evidentiary binders and a USB for the hearing). Therefore, determining an attorney's fee and costs at this point would be premature.

Should the Court grant default judgment, I respectfully recommend the Court require Plaintiff to file a supplemental motion for an attorney's fee and costs that (a) complies with the requirements of Federal Rule of Civil Procedure 54 and Local Rule 7.01; (b) updates the amounts he requests for an attorney's fee and costs; and (c) briefs whether "special circumstances" precluding an

---

[10] "A district court evaluating an attorney's fee motion under § 12205 applies the standard set out in *Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412 (1978)." *Rinehart v. Kelley Buick GMC, Inc.*, No. 8:22-CV-324-JSM-SPF, 2024 WL 4793247, at \*1 (M.D. Fla. Apr. 29, 2024).

award of fees are present here given that the text messages presented at the damages hearing cast doubt on the merits of this lawsuit.

## V.    Conclusion

For the reasons stated, I respectfully RECOMMEND that Plaintiff's Motion for Default Judgment (Doc. 29) be granted in part and denied in part. Specifically, I recommend that the Court:

1.      Grant Plaintiff's motion for default judgment on Plaintiff's ADA Discrimination Claim (Count I) and ADA Retaliation Claim (Count II) and award Plaintiff $4,792.11 in backpay and $500 in compensatory damages, plus post-judgment interest;

2.      Require Plaintiff to file a supplemental motion for an attorney's fee and costs that (a) complies with the requirements of Federal Rule of Civil Procedure 54 and Local Rule 7.01; (b) updates the amounts he requests for an attorney's fee and costs; and (c) briefs whether "special circumstances" precluding an award of fees are present here given that the text messages presented at the damages hearing cast doubt on the merits of this lawsuit; and

3.      Otherwise deny Plaintiff's motion.

In addition, Plaintiff is ORDERED to serve a copy of this Report and Recommendation on Defendant within 7 days (to provide Defendant with the

opportunity to object), and to file a notice of compliance with the Court.

SUBMITTED for consideration on December 31, 2025.

_____
NATALIE HIRT ADAMS
United States Magistrate Judge

NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1. To expedite resolution, parties may file a joint notice waiving the 14-day objection period.